IN RE INTEREST OF MONIQUE H., A CHILD
UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
SHEILA H., APPELLANT.
681 N.W.2d 423

Filed June 22, 2004.   No. A-03-963.

Richard K. Bollerup, of Bollerup Law Offices, P.C., for appellant.

Jodi L. Nelson, Deputy Lancaster County Attorney, and Katherine Gregg, Senior Certified Law Student, for appellee.

INBODY, CARLSON, and MOORE, Judges.

CARLSON, Judge.

## INTRODUCTION

Sheila H. appeals from an order of the separate juvenile court of Lancaster County in which the court found that Monique H. was a juvenile as defined by Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002) in that Monique had been abandoned by Sheila, her mother. For the reasons set forth herein, we affirm.

## BACKGROUND

On October 11, 2002, the State filed a petition alleging that Monique, born August 3, 1992, was a juvenile as defined by § 43-247(3)(a) by reason that Sheila had abandoned Monique, in that Monique had lived with Barbara F., her great-aunt, for most of her life and in that Sheila had had inconsistent and sporadic involvement in Monique's life since 1999 and had generally failed to provide Monique with any parental care or support.

An adjudication hearing was held on the petition on June 6, 2003. At the hearing, Barbara testified that Monique had been living with her in Lincoln, Nebraska, since 1999. Barbara further testified that from the time Monique was born until she began living with Barbara in 1999, Monique stayed with Barbara at least 75 percent of the time. Barbara testified that Sheila moved to Wellington, Kansas, in October 1999 because there was a warrant out for Sheila's arrest. Barbara testified that Monique was already living with her at the time Sheila moved out of Nebraska. Barbara testified that Monique originally began living with her because Sheila was having problems getting Monique to school and because Sheila was not able to take care of Monique. Barbara testified that after Sheila moved out of Nebraska, she would drive Monique to Council Bluffs, Iowa, once a month, and occasionally twice a month, where they would meet Sheila so that Monique and Sheila could spend time together. Barbara testified that the three of them would meet at either a truckstop or a restaurant in Council Bluffs and that the visit would last between 2 and 3 hours. Barbara testified that when Sheila had subsequently moved to Tarkio, Missouri, and to Maitland, Missouri, Monique would sometimes spend the weekend with Sheila. Barbara testified that while Sheila lived out of state, Sheila would talk to Monique on the telephone once a week or once every other week. Barbara testified that after Sheila moved back to Nebraska in August 2002, Sheila came to visit Monique about every other day.

Barbara also testified that between October 1999 and August 2002, there were four or five planned visits that Sheila did not show up for. During this timeframe, there were also five to seven times when Sheila called Barbara and told her to pack up Monique's belongings and to bring Monique to Council Bluffs because she wanted Monique to come and live with her. Barbara testified that she did as Sheila requested but that Sheila actually took Monique home with her on only two of these occasions. Barbara testified that when Sheila did take Monique home with her, Sheila called Barbara a couple of days later and asked Barbara to come and get Monique.

Barbara testified that between October 1999 and August 2002, Sheila did not give her any money for Monique's support but did

occasionally purchase clothes and shoes for Monique. She testified that Sheila purchased around a dozen clothing items during this time period and that the clothes Sheila bought were often too small for Monique. Barbara also testified that Sheila routinely gave Monique birthday and Christmas presents and had visits with Monique at or near those times. Barbara further testified that Sheila took Monique on vacation to North Carolina for about a week in August 2002 and to Florida the year before.

Barbara testified that when she would take Monique to visit Sheila, she would bring Monique's school papers to share with Sheila. Barbara testified that Sheila was uninterested in the papers and kept them on only one occasion. She further testified that Sheila did not participate in any of Monique's extracurricular activities or interests.

Barbara testified that in August 2002, Sheila gave her $5,000 cash and asked her to keep it until Sheila needed it and asked for it back. Barbara opened a new bank account and deposited the money in the account. Barbara testified that in September 2002, Sheila asked for the money and Barbara gave her the $5,000 back.

Barbara further testified that she and Sheila both signed a handwritten agreement giving Barbara permission to enroll Monique in school for the 2000-2001 school year. The agreement was entered into evidence. Barbara testified that for the previous school years, she and Sheila had had similar written agreements. Barbara testified that in August 2001, Sheila granted her a power of attorney over Monique so Barbara could enroll Monique in school for the 2001-2002 school year. The power of attorney document was entered into evidence and showed that Barbara was to have temporary custody over Monique for a period of no more than 6 months. Barbara also testified about a custodial agreement that she and Sheila entered into at the same time as they did the power of attorney. The agreement, which was entered into evidence, gave Barbara temporary custody of Monique and stated that Barbara was not to restrict Sheila's access to Monique.

Sheila testified that Monique started living with Barbara in October 2000. She testified that prior to October 2000, Monique stayed overnight with Barbara only about once a month. Sheila testified that it was also in October 2000 when she moved out of state. Sheila testified that she had Monique live with Barbara

because Sheila was having difficulties in her life and was struggling to support herself. Sheila could not remember whether there was a warrant out for her arrest at the time, and she testified that she moved out of Nebraska to start a new life. She testified that she originally planned to have Monique come and live with her after she found a job and got settled, but later decided to let Monique finish the school year in Nebraska. Sheila testified that while she lived out of state, she had visits with Monique every weekend or every other weekend. She testified that either she would come to Lincoln to visit Monique or pick her up for a weekend visit or she would meet Barbara and Monique at some other location outside of Nebraska for a day visit. Sheila also testified that she would call Monique on the telephone almost every night.

Sheila testified that every time she saw Barbara and Monique, she would either give Barbara money to help with Monique's expenses or spend money on Barbara and Monique, such as buying them dinner. She estimated that she had given Barbara a total of $25,000 but admitted that she had no receipts for any payments because she always gave Barbara cash. Sheila also testified that the amount she gave Barbara at any one time varied. She further testified that she bought Monique something every time she saw her, such as clothes, knickknacks, or stuffed animals. She testified that she never asked Barbara to hold any money for her and that she knows nothing about the $5,000 Barbara claims Sheila gave her in August 2002.

Sheila testified that she tried to stay up to date on Monique's school progress by asking Barbara to bring Monique's school papers and projects to visitations. She testified that Barbara would say that she would bring them but then would show up without them. She testified that she went to one parent-teacher conference for Monique during the time she lived out of state. Sheila further testified that she paid one medical bill for Monique and took her to the dentist on one occasion during the time she lived out of state.

Sheila testified that during the summer of 2002, she took Monique to North Carolina, but further testified that she did not take Monique to Florida in 2001 as Barbara claimed. She testified that Monique spent most of the summer of 2001 with her.

Sheila testified that when she moved back to Nebraska, she visited Monique almost every day.

Sheila's former attorney also testified. He testified that in August 2002, he witnessed Sheila give $5,000 in cash to Barbara and heard Sheila tell Barbara to use $1,000 for Monique and to hold the rest for her.

Monique's deposition testimony was also entered into evidence. Monique testified that she started living with Barbara around the time she started kindergarten and has lived with her ever since. She testified that at the time of her deposition, she was in fourth grade. She testified that when Sheila was living outside Nebraska, she saw Sheila about every other weekend. She testified that Barbara would drive her to Iowa or to wherever Sheila was living at the time for visits. Monique testified that about half of these visits were for an entire weekend. She further testified that during her visits, Sheila would sometimes buy her clothes and shoes. She testified also that when Sheila lived out of state, she talked to Sheila on the telephone about every 2 days. She testified that when Sheila moved back to Nebraska, Sheila came to Barbara's house "about every day." She also testified that in the summer of 2002, she went to North Carolina with Sheila.

On rebuttal, Barbara testified that Sheila never gave her money for Monique and that Sheila only bought Barbara meals twice in a 2-year period. She testified that while Sheila lived out of state, she never came to Nebraska to visit Monique or to pick her up for the weekend. She testified that since 2000, she has taken Monique to all medical appointments and has paid all of Monique's medical bills. In regard to the $5,000, Barbara recalled that Sheila did tell her to use $1,000 for Monique and to hold the rest, but that when Sheila later asked for the money, she gave her the full $5,000 back.

On August 1, 2003, the juvenile court entered an order finding that the State had proved by a preponderance of the evidence that the allegations of the petition were true. The juvenile court found that Monique was a juvenile as defined by § 43-247(3)(a) because she had been abandoned by Sheila, in that Monique had lived with Barbara for most of her life and in that Sheila had had inconsistent and sporadic involvement in Monique's life since

1999 and had generally failed to provide Monique with any parental care or support.

## ASSIGNMENT OF ERROR

Sheila assigns that the juvenile court erred in finding that she had abandoned Monique for a period of at least 6 months and, thus, erred in adjudicating Monique pursuant to § 43-247(3)(a).

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003); *In re Interest of Joshua R. et al.*, 265 Neb. 374, 657 N.W.2d 209 (2003). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

Sheila argues that the juvenile court erred in adjudicating Monique on the basis that she had abandoned Monique for a period of 6 months prior to the filing of the petition; she contends that the evidence does not support such a finding. The "6 months" language asserted by Sheila is found in Neb. Rev. Stat. § 43-292(1) (Reissue 1998), which allows for termination of parental rights when a parent has abandoned a juvenile "for six months or more immediately prior to the filing of the petition." Such language is not found in § 43-247(3)(a), and the juvenile court did not use such language in its order. Section 43-247 states:

> The juvenile court in each county as herein provided shall have jurisdiction of:
>
> . . . .
>
> (3) Any juvenile (a) . . . who is abandoned by his or her parent, guardian, or custodian; who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile . . . .

The State's petition alleged:

> [Monique] is abandoned by her parent, Sheila[, the] Mother of said child[,] in that:
>
> A) Monique . . . has lived with Barbara[,] her great aunt[,] for most of her life. Sheila . . . has had inconsistent and sporadic involvement in [Monique's] life since 1999 and has generally failed to provide said child with any parental care or support.

In the trial court's order adjudicating Monique, it found:

> The allegations of the Petition are true by a preponderance of evidence. . . . While in the custody of . . . Sheila[, Monique] is abandoned by her parent, Sheila[,] mother of said child, in that: Monique . . . has lived with Barbara[,] her great aunt[,] for most of her life. Sheila . . . has had inconsistent and sporadic involvement in [Monique's] life since 1999 and has generally failed to provide said child with any parental care or support. . . . Monique . . . is a child as defined by Neb. Rev. Stat. §43-247(3a) by reason of the lack of proper support, through the fault or habits of . . . Sheila . . . .
>
> . . . .
>
> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Monique . . . is a child as defined by Neb. Rev. Stat. §43-247(3a) by reason of the lack of proper parental care and she is without proper support through the fault or habits of . . . Sheila . . . .

It is clear from the petition and the trial court's findings that the court adjudicated Monique not only on the basis that she is an abandoned child, but also on the basis that she lacks proper parental support and parental care. In family law, the terms "abandoned" and "abandonment" can include many forms of child neglect, and the lines of distinction between the two are not always clear, so that failure to support or care for a child may sometimes be characterized as abandoning a child and sometimes characterized as neglect. See Black's Law Dictionary 1-2 (7th ed. 1999). In any case, what is clear is that the proffer by Sheila's counsel at oral argument of the applicability of Neb. Rev. Stat. § 43-283.01(4)(a) (Reissue 1998) was misplaced. Section 43-283.01(4) provides in relevant part: "Reasonable

efforts to preserve and reunify the family are not required if a court of competent jurisdiction has determined that: (a) The parent of the juvenile has subjected the juvenile to aggravated circumstances, including, but not limited to, *abandonment*, torture, chronic abuse, or sexual abuse." (Emphasis supplied.) The court's order and findings clearly do not reach the level of abandonment contemplated in § 43-283.01(4)(a).

In addition, in arguing that the evidence does not support a finding of abandonment, Sheila relies entirely on cases involving termination of parental rights based on § 43-292(1). Specifically, Sheila claims that based on *In re Interest of B.A.G.*, 235 Neb. 730, 735, 457 N.W.2d 292, 296 (1990), to prove abandonment, the evidence must show that "the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities." The quoted language sets forth what must be proved in a parental rights termination case alleging abandonment. We are unaware of any case where the standard set for such termination cases has been applied to adjudication cases based on abandonment.

Further, the adjudication stage and the termination stage require different burdens of proof. At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003); *In re Interest of T.M.B. et al.*, 241 Neb. 828, 491 N.W.2d 58 (1992). See Neb. Rev. Stat. § 43-279.01(3) (Reissue 1998). The termination stage requires a higher burden of proof: An order terminating parental rights must be based on clear and convincing evidence. See, *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002); *In re Interest of Heather G. et al.*, 12 Neb. App. 13, 664 N.W.2d 488 (2003). Thus, Sheila's reliance on case law involving termination of parental rights in the present adjudication case is misplaced.

The purpose of the adjudication phase is to protect the interests of the child. The parents' rights are determined at the dispositional phase, not at the adjudication phase. *In re Interest of*

*Sabrina K.*, 262 Neb. 871, 635 N.W.2d 727 (2001); *In re Interest of Rebekah T. et al.*, 11 Neb. App. 507, 654 N.W.2d 744 (2002). To obtain jurisdiction over a juvenile, a court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Rebekah T. et al., supra.* If the pleadings and evidence at an adjudication hearing do not justify a juvenile court's acquiring jurisdiction of a child, the juvenile court has no jurisdiction to order a parent to comply with a rehabilitation plan; nor does it have any power over the parent or child at the disposition hearing unless jurisdiction is alleged and proved by new facts at a new adjudication-disposition hearing. *Id.*

Again, the quantitative proof required for an adjudication based on § 43-247(3)(a) is a preponderance of the evidence. See, *In re Interest of Jac'Quez N., supra*; *In re Interest of T.M.B. et al., supra*; § 43-279.01(3). Although Barbara and Sheila presented significantly different versions of Sheila's involvement in Monique's life, the evidence shows that Monique has lived with Barbara since 1999 or 2000 and, thus, that Sheila has not provided a home for Monique during that time. The evidence also shows that for most of the time Monique has lived with Barbara, Sheila has lived out of state. During this time, Barbara was clearly Monique's primary caregiver. Barbara also testified that from the time Monique was born up until the time Monique came to live with her, Monique spent a lot of time with her. Although Sheila testified to the contrary, the juvenile court believed Barbara's testimony. When the evidence is in conflict in a juvenile case, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Jac'Quez N., supra*; *In re Interest of Joshua R. et al.*, 265 Neb. 374, 657 N.W.2d 209 (2003). The evidence also shows that during the time Sheila lived out of state, Sheila was not actively involved in Monique's education or in her extracurricular activities or interests. In addition, since 2000, Sheila has not been responsible for Monique's medical care and medical expenses.

There is conflicting evidence as to whether Sheila provided financial support for Monique during the time Monique has lived with Barbara. However, Sheila has provided no documentation of

any financial support, claiming that her payments to Barbara were all made in cash. Barbara denies receiving any financial assistance from Sheila. Sheila and Barbara also provided conflicting testimony as to how often Sheila bought clothes and meals for Monique. Again, the juvenile court apparently accepted Barbara's testimony, and we give weight to the fact that the juvenile court observed the witnesses and accepted Barbara's version of the facts over Sheila's version. See, *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003); *In re Interest of Joshua R. et al., supra.*

Although the evidence shows that Sheila has been·a part of Monique's life in some respect, she has not provided the consistent care and support of a parent. The evidence shows Sheila's unwillingness or inability, whichever the case may be, to be involved in Monique's daily life and to be a constant, full-time parent to Monique. After a de novo review of the record, we find that the evidence shows by a preponderance that Sheila has abandoned Monique for the purpose of § 43-247(3)(a) in failing to provide Monique with proper support and parental care and that the juvenile court did not err in adjudicating Monique under that statute.

## CONCLUSION

We conclude that the State proved by a preponderance of the evidence that Monique is a juvenile as defined by § 43-247(3)(a). Therefore, the juvenile court did not err in adjudicating Monique. The order of the juvenile court is affirmed.

AFFIRMED.