Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/27/2018 08:10 AM CDT

- 678 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

In re Interest of Jade H. et al.,
children under 18 years of age.
State of Nebraska, appellee,
v. Benjamin T., appellant.

___ N.W.2d ___

Filed March 27, 2018.    No. A-17-513.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

2. **Parental Rights: Proof.** In order to terminate parental rights, a court must find clear and convincing evidence that one of the statutory grounds enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and that termination is in the child's best interests.

3. **Parental Rights.** Neb. Rev. Stat. § 43-292(9) (Reissue 2016) allows for terminating parental rights when the parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse.

4. ____. Whether aggravated circumstances under Neb. Rev. Stat. § 43-292(9) (Reissue 2016) exist is determined on a case-by-case basis.

5. **Parental Rights: Words and Phrases.** Where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety, and welfare of the child, they are aggravated.

6. **Parental Rights: Minors: Words and Phrases.** The term "aggravated circumstances," as used in Neb. Rev. Stat. § 43-283.01(4)(a) (Reissue 2016), embodies the concept that the nature of the abuse or neglect must have been so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child and would place the child in a position of an unreasonable risk to be reabused.

- 679 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

7. **Parental Rights.** The failure of a parent to seek medical treatment for a child when the child has suffered physical injuries meets the statutory requirement of Neb. Rev. Stat. § 43-292(9) (Reissue 2016).

8. **Parental Rights: Proof.** Only one statutory ground for termination need be proved in order for parental rights to be terminated.

9. **Parental Rights: Juvenile Courts.** Reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under Neb. Rev. Stat. § 43-292(6) (Reissue 2016).

10. **Parental Rights: Proof.** In addition to proving a statutory ground, the State must show that termination is in the best interests of the child.

11. **Constitutional Law: Parental Rights: Proof.** A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit.

12. **Parental Rights: Presumptions: Proof.** There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit.

13. **Parental Rights: Statutes: Words and Phrases.** The term "unfitness" is not expressly used in Neb. Rev. Stat. § 43-292 (Reissue 2016), but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests.

14. **Child Custody: Words and Phrases.** Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.

15. **Parental Rights.** The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other.

Appeal from the Separate Juvenile Court of Douglas County: Christopher Kelly, Judge. Affirmed.

Darren J. Pekny and Courtney R. Ruwe, of Johnson & Pekny, L.L.C., for appellant.

Donald W. Kleine, Douglas County Attorney, Sarah Schaerrer, and Laura Elise Lemoine, Senior Certified Law Student, for appellee.

- 680 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

Pirtle, Riedmann, and Arterburn, Judges.

Pirtle, Judge.

## INTRODUCTION

Benjamin T. appeals the order of the separate juvenile court of Douglas County terminating his parental rights to his three children. He challenges the juvenile court's finding that the minor children came within the meaning of Neb. Rev. Stat. § 43-292(2), (8), (9), and (10)(d) (Reissue 2016); that no reasonable efforts were required under Neb. Rev. Stat. § 43-283.01 (Reissue 2016); and that termination was in the best interests of the children. Following our de novo review of the record, we affirm.

## BACKGROUND

Benjamin is the father of Jade H., Aly T., and Kazlynn T., born May 2015, January 2010, and June 2008, respectively. On the afternoon of October 24, 2016, the children were in Benjamin's vehicle, which he was driving, when a collision occurred. All the children were properly restrained in the back seat. Kazlynn was severely injured in the collision and placed on life support. Aly was unconscious after the accident and had serious injuries, but was doing well at the time of the termination hearing. Jade suffered only minor injuries. The children were placed in protective custody the next day.

Immediately after the accident, Randy Plugge, the driver of the other vehicle involved in the collision, got out of his vehicle and went over to Benjamin's vehicle to see if he was all right. Plugge talked to him briefly and said he was going to call the 911 emergency dispatch service. Plugge did not see the children in the back seat because airbags had deployed. When Plugge walked away from Benjamin's vehicle, Benjamin drove off. Benjamin drove to a park where an Omaha police officer found him disposing of alcohol that had been in his vehicle.

In November 2016, the State filed an "Amended Petition and Termination of Parental Rights" alleging that the children

- 681 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016); that reasonable efforts under § 43-283.01 were not required because Benjamin had subjected the children to aggravating circumstances and had committed a felony assault which resulted in serious bodily injury to them; and that termination of Benjamin's parental rights was warranted under § 43-292(2), (8), (9), and (10), which termination was in the children's best interests.

The evidence at trial showed that for the 4 to 5 years before trial, Benjamin was the primary caregiver for Jade, Aly, and Kazlynn, and was the only person they knew as a parent. Jade was placed in foster care when she was 6 weeks old due to her mother's alcohol addiction, but Benjamin received placement and eventual custody of Jade when she was 9 months old.

After the accident, Aly and Jade were placed in the care of the woman who had been Jade's foster mother when she was removed from her mother's care at 6 weeks old. From the time they were placed with her until the termination trial, Benjamin maintained contact from jail with Aly and Jade through telephone calls. Telephone calls would occur once or twice per week, and the foster mother testified that all conversations were appropriate. She testified that Aly would tell Benjamin she loved him. Aly also prayed for him every night. The foster mother testified that she believed it was in Aly's best interests to continue to have contact with Benjamin.

Plugge, the other driver involved in the accident, testified that he was going straight at the intersection where the accident occurred and his light was green. He stated that he was driving "either 40 or 50" miles per hour and that he believed the speed limit was 45 miles per hour. Plugge denied stating to Benjamin that he was sorry and that he did not see him. He testified that he asked Benjamin why he had "run the red light." Plugge also denied that Benjamin told him his children were in the vehicle and he needed to get to a hospital. However, Omaha police officer Matthew Kelly testified that Plugge told

- 682 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

him that after the accident, Benjamin yelled from his vehicle that he was taking his children to the hospital.

Kelly also testified that Plugge told him he had a green light at the intersection, but there were no independent witnesses to the accident that could verify which direction of traffic had the green light at the time of the collision. Kelly testified that Benjamin's statement in regard to his location and the direction he was headed at the time of the collision was inconsistent with what he found at the scene. Kelly stated that in his opinion, Plugge had a green light and Benjamin had a red light at the time of the collision, and that his opinion was based on Plugge's statement that he had a green light and on Benjamin's inconsistent statements. Kelly testified that he could not tell who "ran the red light" based on the evidence at the scene of the accident.

Omaha police officer Jodi Sautter testified that after the accident, she was the officer that located Benjamin at the park, which was about 16 blocks from the scene of the accident. As she drove into the park, she saw Benjamin's vehicle and observed Benjamin running away from the vehicle. When she got closer, Benjamin appeared to throw something into a trash can and started walking back toward his vehicle. Sautter told Benjamin to get on the ground, and she restrained him. She testified that she could smell an odor of alcohol when she handcuffed him. At that time, Benjamin stated that his children were in the vehicle. She looked inside the vehicle and saw that the children were badly injured. Sautter called for medical assistance and began trying to help the children. Aly and Kazlynn were both unconscious. Kazlynn had a hematoma on the top of her head and was bleeding from her nose and mouth. Sautter testified that she could also smell alcohol inside the vehicle and that she observed an open can of beer spilled on the floorboard on the driver's side of the vehicle. Sgt. John Wells testified that there was also a beer can on the floorboard of the passenger side, as well as a bottle of whiskey in the vehicle. Wells also testified that the trash

- 683 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
25 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

can, which Sautter had observed Benjamin throwing something into, contained two unopened cans of beer and a bottle of whiskey.

Omaha police officer Nicholas Andrews testified that he did an investigation of Benjamin for driving under the influence of alcohol (DUI). He testified that he could smell an odor of alcohol when Benjamin was in the back seat of his police cruiser. He stated that Benjamin had bloodshot eyes, slurred speech, and a "disheveled look." Andrews had Benjamin perform field sobriety tests which indicated Benjamin was impaired. He subsequently had Benjamin do a preliminary breath test, which Benjamin failed. Andrews stated that based on the field sobriety tests and the preliminary breath test, Benjamin was under the influence of alcohol such that he could not safely operate a motor vehicle.

Omaha police officer Kevin O'Keefe interviewed Benjamin at the hospital after the accident. Benjamin told him he had consumed one beer and two wine coolers before the accident. He also stated that he was on two prescription medications and that he felt the effects of those more than the effect of the alcohol he had consumed. Benjamin told O'Keefe that after the collision, he saw Kazlynn bleeding from her mouth and left the scene to take the children to the hospital. O'Keefe testified that when he asked Benjamin about discarding alcohol in a trash can after the accident, Benjamin did not believe he did so. Benjamin admitted there was alcohol in his vehicle, but said it was not open. O'Keefe testified that Benjamin did not specifically say he had a green light at the time of the collision, but did state that the accident was Plugge's fault.

Following the accident, Benjamin was transported to the hospital where blood was drawn from him for testing. The nurse that drew Benjamin's blood testified that Benjamin told her he looked at the children in the back seat after the accident and got scared. The laboratory report with the results of Benjamin's blood test was entered into evidence, as well as testimony from the forensic chemist who tested the blood.

- 684 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
25 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

The results showed that Benjamin's blood alcohol content was ".115 plus or minus .003 grams of ethanol per 100 milliliters of blood." There was also evidence that Benjamin had been convicted of DUI four times prior to the accident. The convictions were in 2003, 2005, 2007, and 2009.

Dr. Andrew Macfadyen, an attending physician in the pediatric intensive care unit (ICU) at the hospital, testified regarding the medical condition of Aly and Kazlynn after the accident. Macfadyen testified that when Aly came into the ICU, she was not opening her eyes and would only respond to painful stimuli. Aly had a small hemorrhage in the part of her brain "known as the internal capsule," a concussion, and a bruise on her lung. She was in the ICU for 3 days with a severe traumatic brain injury. He testified that she improved during the course of those 3 days and was transferred from ICU to a regular hospital floor.

In regard to Kazlynn, Macfadyen testified that he first saw her the morning after the accident. She had a breathing tube and would only move her eyes a little bit in response to painful stimuli, but otherwise did not move. She had hemorrhaging in part of her "internal capsule," a skull fracture, a jaw fracture, severe swelling of her brain, and a laceration on her forehead and on her chin. Her pituitary gland, which is considered part of the brain, was also injured. Macfadyen testified that swelling of the brain is a very serious injury and often results in permanent injury to the brain. As a result of the swelling, a neurosurgeon had to remove parts of her skull on each side of her brain to allow her brain to keep swelling, otherwise she would have died from the swelling. Macfadyen testified that a CT scan performed a few days later showed that her condition was getting worse. He also stated that a physical examination indicated she had a severe brain injury. In Macfadyen's opinion, all areas of her brain were affected and she will never completely recover.

Macfadyen testified that Kazlynn's long-term prognosis is "really, really bad" and that she is going to be "neurologically

- 685 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

devastated." He testified that someone is going to have to care for her for the rest of her life. Macfadyen testified that he does not expect her to ever walk, talk, or be aware of her environment. He stated that the best that could be hoped for was that "maybe she could hear somebody, maybe respond to a voice, maybe something might make her happy."

Macfadyen testified that an injury to the head or brain should be treated immediately. Any delay in treating a brain injury results in more damage to the brain and worsens the outcome. He stated, "In Kazlynn's case specifically, a delay in her care [following the accident] would have worsened her outcome."

Macfadyen testified that when Kazlynn left his care in the ICU, she was not breathing on her own. He testified that at the time of the termination trial, Kazlynn was breathing on her own but did not respond to voices or music. A CAT scan from February 2017 showed that there are areas of her brain that are "gone" and that there are "large holes" where those parts of her brain used to be. He testified that she has not and will not recover from her brain injury.

The foster mother testified that when Jade was placed in her care the first time, Benjamin had supervised visits with Jade, and that during those times, she observed his interactions with Jade, as well as with Aly and Kazlynn. The foster mother testified that it appeared to her that Benjamin had a bond with his children and that it was apparent they loved him and he loved them. She testified that he seemed to appropriately care for the children "for the most part." On cross-examination, the foster mother testified that the first time she met Benjamin at his home she believed he had been drinking. She testified that her belief was based on Benjamin's behavior and actions, as well as the fact that she saw alcohol in the home and could smell an odor of alcohol. She also testified that she was concerned about Benjamin's drinking at Jade's first birthday party. She testified that there "was a lot of drinking going on at the birthday party" and that it seemed like Benjamin "could

- 686 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

not stop drinking that day." The foster mother testified that throughout the time she has known Benjamin, "he seemed to drink a lot."

The case manager for Benjamin and the children testified that Benjamin has been at a correctional center since she was assigned to the case in October 2016. She testified that there had been three previous intakes in regard to Benjamin, one of which was in 2015 and alleged that Benjamin was "passed out and puking all the time, and that he was intoxicated and that the children were having to make their own meals." However, the case manager testified that nothing was ever filed on Benjamin. She also testified that based on Benjamin's prior DUI convictions and the prior intakes related to Benjamin's alcohol issues, she opined that it was in the children's best interests to terminate Benjamin's parental rights.

Following trial, the juvenile court adjudicated the children and terminated Benjamin's parental rights based on § 43-292(2), (8), (9), and (10) and found that termination was in their best interests. The court also found that reasonable efforts were not required under § 43-283.01.

## ASSIGNMENTS OF ERROR

Benjamin assigns that the juvenile court erred in (1) finding the children came within the meaning of § 43-292(2), (8), (9), and (10); (2) finding that reasonable efforts were not required under § 43-283.01; and (3) finding that termination of his parental rights was in the best interests of the children.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

- 687 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
25 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

ANALYSIS

*Statutory Grounds.*

[2] In order to terminate parental rights, a court must find clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Austin G.*, 24 Neb. App. 773, 898 N.W.2d 385 (2017). In the present case, the juvenile court found that the State established by clear and convincing evidence that grounds for termination existed under § 43-292(2), (8), (9), and (10).

[3-5] Section 43-292(9) allows for terminating parental rights when the parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse. *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017). Whether aggravated circumstances under § 43-292(9) exist is determined on a case-by-case basis. *In re Interest of Elijah P. et al., supra*. The Legislature has not defined "aggravated circumstances" in the juvenile code, but the Supreme Court has stated that "'where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety, and welfare of the child, they are "aggravated" . . . .'" *In re Interest of Jac'Quez N.*, 266 Neb. 782, 791, 669 N.W.2d 429, 436 (2003), quoting *New Jersey Div. v. A.R.G.*, 361 N.J. Super. 46, 824 A.2d 213 (2003).

[6] The term "aggravated circumstances," as used in § 43-283.01(4)(a), embodies the concept that the nature of the abuse or neglect must have been so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child and would place the child in a position of an unreasonable risk to be reabused. *In re Interest of Jac'Quez N., supra*.

[7] Based on our de novo review of the record, we conclude that the State proved that the children came within the meaning of § 43-292(9) by clear and convincing evidence. The

- 688 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

Nebraska Supreme Court has found that the failure of a parent to seek medical treatment for a child when the child has suffered physical injuries meets the statutory requirement of § 43-292(9). See *In re Interest of Jac'Quez N., supra*. In the present case, Benjamin failed to get his injured children medical treatment after the accident.

In *In re Interest of Jac'Quez N., supra*, the Supreme Court concluded that aggravated circumstances existed where the parents delayed seeking medical attention for 2 days when the child suffered obvious, serious physical injuries. The juvenile court had terminated the father's parental rights under two subsections of § 43-292, including subsection (9), but determined the State had failed to meet its burden of proof as to the mother and did not terminate her rights. The State appealed, and the Supreme Court reversed the juvenile court's finding in regard to the mother. The Supreme Court concluded that although the evidence did not tend to establish the mother inflicted the initial injuries on the child, it clearly and convincingly established that she delayed seeking medical treatment for 48 hours after the child had received obvious and serious injuries, thus severely neglecting his medical needs. The mother did not seek medical treatment sooner, because she feared the child would be taken from her.

The present case is similar to *In re Interest of Jac'Quez N., supra*, in that Aly's and Kazlynn's injuries were obvious and serious after the accident. Police officers testified that Aly and Kazlynn were both unconscious in the back seat of the vehicle and that Kazlynn was bleeding profusely from a head wound and a cut to the neck area. There was evidence that at the scene of the crash, Benjamin told Plugge that he needed to get his children to the hospital. Further, in Benjamin's interview with the police following the accident, he stated that he looked at the children in the back seat and saw that Kazlynn was bleeding so he wanted to get the children to the hospital. Benjamin also told the nurse who drew his blood that he looked at the children in the back seat after the accident and

- 689 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
25 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

got scared. The evidence demonstrates that Benjamin was well aware that his children were injured and in immediate peril.

Despite knowing that the children were seriously injured, Benjamin did not get the children medical care. Rather, he fled the scene of the accident prior to the arrival of emergency medical personnel and drove about 16 blocks to a park where he disposed of incriminating alcohol in the vehicle. He delayed seeking medical treatment in an effort to protect himself from suspicion.

There was evidence from Macfadyen that an injury to the head or brain should be treated immediately and that any delay in treating a brain injury results in more damage to the brain and worsens the outcome than if it had been treated immediately. He stated, "In Kazlynn's case specifically, a delay in her care [following the accident] would have worsened her outcome."

As in *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003), the evidence in the instant case established that Benjamin failed to get his children medical treatment when they had obvious and serious physical injuries, thus severely neglecting their medical needs. His failure to immediately seek medical care for his children was a conscious, intentional decision made in an effort to protect himself despite knowing the children needed medical attention.

The evidence of Benjamin's failure to seek medical treatment for the children for his own personal gain is not the only evidence we have taken into account in concluding that Benjamin subjected his children to aggravated circumstances in accordance with § 43-292(9). There was evidence that Benjamin has had an alcohol problem for an extended period of time. At the time of the accident, Benjamin had four prior DUI convictions dating as far back as 2003, with the most recent conviction being in 2009. The foster mother testified that the first time she met Benjamin, she believed he had been drinking based in part on his behavior. At Jade's first birthday

- 690 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

party, the foster mother had concerns about Benjamin's drinking. She testified that throughout the time she has known him, "he seemed to drink a lot."

Further, Benjamin was intoxicated at the time of the accident on the afternoon of October 24, 2016. Andrews, the officer who had Benjamin perform field sobriety tests and a preliminary breath test, testified that based on those tests, Benjamin was under the influence of alcohol such that he could not safely operate a motor vehicle. The results of Benjamin's blood test showed that his blood alcohol content was ".115 plus or minus .003 grams of ethanol per 100 milliliters of blood." Despite being intoxicated, Benjamin put his children in the vehicle and transported them, putting their lives and his own at risk.

Based on Benjamin's failure to get his children medical care knowing they were physically injured, his chronic alcohol problem, and his willingness to place the children at risk, we conclude that termination of Benjamin's parental rights is warranted under § 43-292(9).

[8] Only one statutory ground for termination need be proved in order for parental rights to be terminated. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). Because we conclude that there is clear and convincing evidence to show that aggravated circumstances existed under § 43-292(9), we need not discuss the other statutory grounds which the court found to exist.

*Reasonable Efforts at Reunification.*

[9] Benjamin next assigns that the juvenile court erred in finding that reasonable efforts were not required under § 43-283.01. In *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002), the Nebraska Supreme Court clearly indicated that reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under § 43-292(6). See, also, *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009).

- 691 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
25 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

Because we have determined that termination was proper pursuant to § 43-292(9), we need not determine whether the juvenile court erred in finding that reasonable efforts were not required under § 43-283.01.

*Best Interests and Parental Fitness.*

[10-15] Benjamin next asserts the juvenile court erred in finding that termination of his parental rights was in his children's best interests. In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Kendra M. et al., supra*. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Kendra M. et al., supra*. In discussing the constitutionally protected relationship between a parent and a child, the Nebraska Supreme Court has stated: "'"Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being."'" *Id.* at 1033-34, 814 N.W.2d at 761. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *In re Interest of Kendra M. et al., supra*.

Prior to the accident, Benjamin had four DUI convictions dating back to 2003. The present juvenile matter began as a

- 692 -

Nebraska Court of Appeals Advance Sheets
25 Nebraska Appellate Reports
IN RE INTEREST OF JADE H. ET AL.
Cite as 25 Neb. App. 678

result of Benjamin's choosing to drive under the influence of alcohol with his children in his vehicle, putting them at risk. He then had an accident, where two of the children suffered serious injuries. Benjamin made the conscious decision to leave the scene of the accident before emergency medical personnel arrived, knowing that his children were injured, so he could dispose of alcohol in his vehicle. Benjamin's actions demonstrate that he is not willing to put his children's needs above his own and will not protect them at any cost. The children would be at risk for further harm in Benjamin's care.

The case manager also testified that based on Benjamin's prior DUI convictions and the prior intakes related to Benjamin's alcohol issues, she opined that it was in the children's best interests to terminate Benjamin's parental rights.

Based upon our de novo review of the record, we find clear and convincing evidence that Benjamin's personal deficiencies have prevented him from performing his reasonable parental obligations to Jade, Aly, and Kazlynn in the past and would likely prevent him from doing so in the future. Accordingly, the presumption of fitness has been rebutted. We also find that it was shown by clear and convincing evidence that termination of Benjamin's parental rights would be in the children's best interests.

## CONCLUSION

Based on our de novo review, we conclude that the juvenile court did not err in terminating Benjamin's parental rights to Jade, Aly, and Kazlynn. Accordingly, the court's order is affirmed.

Affirmed.